UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GENEVIEVE DINGMAN,

                              Plaintiff,        **No. 6:16-cv-06107(MAT)**
                                                **DECISION AND ORDER**

              -vs-

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                              Defendant.
_____

## I.   Introduction

     Genevieve  Dingman  ("Plaintiff"),  represented  by  counsel,
brings  this  action  pursuant  to  Titles  II  and  XVI  of  the  Social
Security  Act  ("the  Act"),  seeking  review  of  the  final  decision  of
the  Acting  Commissioner  of  Social  Security  ("the  Commissioner")[1]
denying  her  application  for  Disability  Insurance  Benefits  ("DIB")
and  Supplemental  Security  Income  ("SSI").  This  Court  has
jurisdiction  over  the  matter  pursuant  to  42  U.S.C.  §§  405(g),
1383(c).

## II.  Procedural Status

     Plaintiff  filed  applications  for  DIB  and  SSI  on  September  19,
2012,  alleging  disability  beginning  September  18,  2009,  due  to  back
problems,  neck  problems,  shoulder  problems,  and  ankle  problems.

---

[1]
     Nancy  A.  Berryhill  is  now  the  Acting  Commissioner  of  Social  Security.
Pursuant  to  Rule  25(d)  of  the  Federal  Rules  of  Civil  Procedure,  Nancy  A.
Berryhill  should  be  substituted  for  Acting  Commissioner  Carolyn  W.  Colvin  as  the
defendant  in  this  suit.  No  further  action  needs  to  be  taken  to  continue  this  suit
by  reason  of  the  last  sentence  of  section  205(g)  of  the  Social  Security  Act,  42
U.S.C.  §  405(g).

These applications were denied on February 27, 2013, and Plaintiff requested a hearing. On May 27, 2014, a videoconference hearing was held before administrative law judge Roxanne Fuller ("the ALJ"). (See T.31-54).[2] Plaintiff appeared with her attorney and testified, as did impartial vocational expert, Howard Steinberg ("the VE"). The ALJ issued an unfavorable decision (T.12-26) on August 15, 2014, finding Plaintiff not disabled under the Act. Plaintiff sought review of the ALJ's decision by the Appeals Council, which denied review on December 21, 2015 (T.1-8). The ALJ's decision therefore became the Commissioner's final decision. This timely action followed.

The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The Court adopts and incorporates by reference herein the undisputed and comprehensive factual summaries contained in the parties' briefs. The record will be discussed in more detail below as necessary to the resolution of this appeal. For the reasons that follow, the Commissioner's decision is affirmed.

## THE ALJ'S DECISION

The ALJ found that Plaintiff's date last insured, for DIB purposes, was December 31, 2015. (T.14). At step one of the sequential evaluation, the ALJ determined that Plaintiff had not

---

[2] Citations in parentheses to "T." refer to pages from the certified transcript of the administrative record.

engaged in substantial gainful activity since her alleged onset date of September 18, 2009. (Id.). At step two, the ALJ found that Plaintiff's degenerative disc disease and partial rotator cuff tear (right shoulder), were "severe impairments." (Id.). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T.16).

The ALJ then assessed Plaintiff as having the residual functional capacity ("RFC") to perform light work as defined in the Commissioner's Regulations,[3] with the following limitations: Plaintiff could never climb ramps, stairs, ladders, ropes, or scaffolds; could occasionally balance, stoop, crouch, kneel, and crawl, could frequently reach and overhead reach with both arms; tolerate occasional exposure to moving mechanical parts and unprotected heights; and occasionally operate a motor vehicle. (T.17).

At step four, the ALJ determined that Plaintiff was able to perform her past relevant work as a teacher aide and production solderer. (T.24).

Notwithstanding her finding that Plaintiff was capable of performing her past relevant work, the ALJ continued to step five.

---

[3]
"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

The ALJ found that Plaintiff was a "younger individual," with at least a high school education, and ability to communicate in English. (T.25). The ALJ determined that the transferability of skills was not material because the Medical-Vocational Guidelines ("the Grids"), see 20 C.F.R. Part 404, Subpart P, Appendix 2, would support a finding of "not disabled" regardless of whether Plaintiff had transferable job skills. (T.25). The ALJ then noted that if Plaintiff had the RFC for a full range of work at the light level, then Rule 202.21 of the Grids would direct a finding of "not disabled." (Id.). However, Plaintiff's ability to perform all, or substantially all, of the requirements of light work was eroded by additional limitations. (Id.). The ALJ, therefore, considered the VE's testimony. (T.26, 49-54).

At the hearing, the VE identified Plaintiff's past relevant work as a teacher aide (Dictionary of Occupational Titles ("DOT")[4] No. 249.367-074), classified as light work; packer (DOT No. 920.587-018), classified as medium work; and production solderer (DOT No. 813.684-022), classified as light work. (T.50). The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education, work experience, and the above-described RFC. The VE testified that such a person could perform Plaintiff's past relevant work as a teacher's aide and production solderer. (T.51).

---

[4] U.S. Department of Labor, Dictionary of Occupational Titles, (4th ed. rev. 1991).

The VE also testified that other jobs existed in the national economy that a person with Plaintiff's RFC could perform, including cashier (DOT No. 211.462-010, light work; 821,000 positions nationally and 48,000 positions regionally); sales attendant (DOT No. 299.677-010, light work; 2,152,000 positions nationally and 12,800 positions regionally); and office helper (DOT No. 239.567-010, light work; 188,000 positions nationally and 8,300 positions regionally). (T.26, 52). Based on the VE's testimony, the ALJ found that Plaintiff was not disabled under the Act. (T.26).

## SCOPE OF REVIEW

A decision that a claimant is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. See 42 U.S.C. § 405(g). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the district court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). This deferential standard is not applied to the Commissioner's application of the law, and the district court must independently determine whether the Commissioner's decision applied the correct legal standards in determining that the claimant was not disabled. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Failure to apply the correct legal standards is grounds for reversal. Id. Therefore, this Court first reviews whether the applicable legal standards were correctly

applied, and, if so, then considers the substantiality of the evidence. <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987).

**DISCUSSION**

## I.   Erroneous Weighing of Various Medical Opinions

Plaintiff argues that the ALJ erred in weighing the opinions of Dr. Rebecca Wadsworth, Dr. Phillip Vitticore, Dr. Karl Eurenius, and Physical Therapist Kim Jablonski. As discussed further below, the Court finds that the ALJ's assessments of the opinions were not legally erroneous and were based on substantial evidence in the record.

### A.   Legal Principles

The relevant factors to be considered in determining what weight to afford a medical opinion include the length, nature and extent of the treatment relationship; relevant evidence supporting the opinion; the consistency of the opinion with the record as a whole; the treating source's area of specialization, if any; and any other relevant factors brought to the Commissioner's attention. <u>See</u> 20 C.F.R. §§ 404.1527(c), 416.927(c); SSRs 06-03p and 96-2p. A treating physician's opinion is due controlling weight only if that opinion is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). When a treating source's opinion is not afforded controlling weight, the factors listed above are considered in determining what

weight to afford the opinion. See 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). SSR 06-03p states that "[i]n addition to evidence from 'acceptable medical sources,' [the ALJ] may use evidence from other sources," as defined in 20 C.F.R. §§ 404.1513(d) and 416.913(d), "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." Pursuant to SSR 06-03p, the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) are also applicable to the evaluation of opinion evidence from "other sources."

## B.   The Opinions

### 1.   Dr. Rebecca Wadsworth

On November 1, 2012, Plaintiff asked her primary care provider, Dr. Rebecca Wadsworth, to complete a Residual Functional Capacity Questionnaire ("RFC Questionnaire") (T.257-58). Dr. Wadsworth stated that she saw Plaintiff every one to six months, but the record does not indicate that frequency of visits by Plaintiff. The Court notes that Plaintiff's onset date is September 18, 2009, the date she was in a motor vehicle accident ("MVA") in which she was struck directly on the rear driver's side of her car. Following the MVA, she went to the emergency room, complaining of pain to the head, back, shoulders and right ankle. A series of x-rays at the hospital revealed some mild degenerative joint disease to the thoracic spine, but the images of the right foot, lumbar spine, cervical spine and chest were all unremarkable.

Plaintiff was diagnosed with cervical and lumbosacral strain, right ankle sprain, status post-MVA. She was discharged that day from the hospital. (See T.307-16).

Plaintiff followed up with Dr. Wadsworth, who referred her for physical therapy on September 21, 2009, for treatment of her back and shoulder pain following the MVA. On September 23, 2009, Plaintiff saw the physical therapist, who observed restricted range of motion ("ROM") in the neck with tightness and spasms from the cervical to lumbar region. (T.347-47). On September 30, 2009, Dr. Wadsworth prescribed a TENS unit for Plaintiff to use at home. (T.344). On October 12, 2009, the physical therapist stated that Plaintiff was "doing well." On October 19th, the physical therapist noted that Plaintiff "saw MD-can go back to work, no lifting, no mopping, etc." (T.341). She was to continue physical therapy. Plaintiff's last visit was on November 25, 2009, at which time the only subjective symptom noted by the physical therapist was that Plaintiff was "doing okay." (T.333).

Plaintiff's next records from Dr. Wadsworth are from October 10, 2012, a month after she filed the instant disability claim, when she sought treatment for lower back pain and neck pain, as well as an acute episode of viral bronchitis.[5] (T.384-85).

---

[5]

Plaintiff presented to the Clifton Springs Hospital and Clinic's emergency department complaining of shortness of breath on September 28, 2012. (T.478-81). A chest x-ray revealed bilateral interstitial disease, suspected bronchiectatic changes, and osteopenia.

Dr. Wadsworth noted that Plaintiff continued to smoke half a pack of cigarettes a day despite being ill with bronchitis. Plaintiff reported she had trouble lifting more than 10 pounds at a time, or twisting, without pain. On examination, Plaintiff's neck ROM was restricted by about 20 degrees in either direction. She had been prescribed Flexeril, but felt it was not working, and wanted to try Soma (a narcotic). Dr. Wadsworth declined to provide narcotics despite because she felt Plaintiff needed to stay active as much possible. (T.384). Plaintiff expressed her intention to seek out another physician because she was unhappy with Dr. Wadsworth's care. Although she refused to prescribe narcotics, Dr. Wadsworth did approve a parking permit for Plaintiff to use on campus, characterizing Plaintiff's lower back pain as a "permanent disability." Later in October 2012, Dr. Wadsworth noted that Plaintiff's drug test was "positive for Vicodin wh[ich] she reportedly had not had for months . . . [I]t is clear she is getting it by diversion" (T.380), since Dr. Wadsworth had refused to prescribe it for her.

Plaintiff next saw Dr. Wadsworth on November 1, 2012 visit, when she her to complete the RFC Questionnaire. In the RFC Questionnaire, Dr. Wadsworth stated that Plaintiff had "constant" pain which would frequently interfere with her attention and concentration. (T.257). For medications, Plaintiff took Naprosyn and Tylenol, with no side effects. During a normal workday, in

additional to normal breaks, Plaintiff would need to recline or lie down, for an unspecified amount of time. (T.257). Plaintiff could sit for 10 to 15 minutes at a time, and stand/walk for 5 to 10 minutes at a time. (Id.). During an 8-hour workday, she could sit for a total of 4 hours and stand/walk for a total of 3 to 4 hours (Id.). She would also need to shift positions at will and take unscheduled 5-minute breaks every 15 minutes. (Id.). Plaintiff was only able to lift/carry less than 10 pounds. (T.258). She could use her right hand 10% of the day to grasp or perform fine manipulation, but could never reach with her right arm (Id.). Plaintiff could use her left hand 50% of the time to grasp or perform fine manipulation, and reach with her left arm 40% of the time. (Id.). She would miss work more than 4 times a month, and, according to Dr. Wadsworth, was incapable of working full-time on a sustained basis. (Id.).

The ALJ accorded Dr. Wadsworth's opinion "little weight" finding that it was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion." (T.23). The ALJ accurately noted that Dr. Wadsworth "did not document positive objective clinical or diagnostic findings to support the functional assessment." (Id.). The degree of support given by a treating source for his or her opinion is a proper factor to consider. See 20 C.F.R. § 404.1527(d)(3), 416.927(d)(3) ("The better an explanation a source provides for an opinion, the

more weight [the Commissioner] will give that opinion."). While
the Second Circuit has held that "the lack of specific clinical
findings in the treating physician's report did not, standing by
itself, justify the ALJ's failure to credit the physician's
opinion[,]" Clark v. Commissioner of Social Sec., 143 F.3d 115, 118
(2d Cir. 1998) (citation omitted), the ALJ here did not solely rely
on the lack of specific clinical findings. Instead, the ALJ
appropriately took into consideration Plaintiff's benign objective
test results and her conservative treatment, as well as the absence
of any treatment for years at a time, and found them inconsistent
with the extremely restrictive limitations in Dr. Wadsworth's
opinion. Notably, despite alleging disabling limitations since her
September 18, 2009 MVA, Plaintiff only attended physical therapy
sessions from August 12, 2009, to November 25, 2009. (T.333). She
had been released to go back to work on October 19, 2009, with "no
lifting, mopping, etc." (T.341). Even though she had been treating
with Dr. Wadsworth since 2009, she did not seek other  medical
treatment from Dr. Wadsworth or any other source for her alleged
back, neck, and shoulder pain until October 2012. The ALJ
reasonably concluded that Dr. Wadsworth's opinion "apparently
relied quite heavily" on the subjective report of symptoms and
limitations provided by [Plaintiff]," which Dr. Wadsworth appeared
to accept "uncritically." However, ALJ found that "there exist good
reasons for questioning the reliability of [Plaintiff's] subjective

-11-

complaints," (id.), as she discussed elsewhere in her decision (id.).

Finally, the ALJ found that Dr. Wadsworth's RFC Questionnaire was "inconsistent with the subsequent records from 2013 and 2014, which do not list [sic] the claimant as quite so limited." This is not a misrepresentation of the record. For instance, on January 16, 2013, Plaintiff saw primary care physician Dr. Debbie Heit to establish care; Plaintiff's primary concern was an itchy rash on her hands and chest. (T.461). She reported shoulder, neck, and back pain, with a pain level of 6/10, but on musculoskelatal examination, Dr. Heit recorded that her "gait" and "station" were "normal." (T.461). She returned to Dr. Heit on February 15, 2013, and stated that she was unable to lift her right arm past her shoulder without pain. (T.463). On examination, her gait, station, head, and neck were normal. (T.458). A March 20, 2013 x-ray of Plaintiff's right shoulder revealed no evidence of fracture, dislocation, or significant arthritic changes (T.303), although an April 12, 2013 MRI scan showed a partial rotator cuff tear in Plaintiff's right shoulder (T.294). However, also on April 12, 2013, Plaintiff saw physician's assistant Timothy Button ("PA Button"), and she had no pain in her neck, and range of motion in her cervical spine was normal. (T.298). She saw Dr. Heit on April 23, 2013, and denied any musculoskeletal symptoms. Upon examination, she had full range of motion in her neck. (T.472).

On June 4, 2013, Plaintiff referred to Olaf Lieberg, M.D. for further evaluation of her right shoulder, neck and lower back pain. She claimed that she did not leave the house due to her pain[6] and that she was a non-smoker.[7] On examination, her neck displayed some limited motion inflexion and lateral bending. Her neurological examination was grossly normal. The right shoulder displayed tenderness to palpitation over the anterolateral aspect, with flexion of shoulder to 85 degrees and abduction to 70 degrees. Her lower back showed discomfort to palpitation with flexion of 40 degrees, extension of 5 degrees, and lateral bending of 10 degrees. Dr. Lieberg sent Plaintiff for additional studies, which were generally unremarkable. A June 7, 2013 cervical spine MRI displayed minimal cervical disc degeneration with slightly decreased disc signal intensity and C3-C4 and C4-C5, as well as slight anterior spurring at C4-C5. These findings were described as "truly minimal," with no remarkable facet degeneration. A lumbar MRI showed no evidence of disc degeneration, no herniation, and no

---

[6]

   About a month prior to seeing Dr. Lieberg, Plaintiff saw her primary care physician, Dr. Heit. She reported doing "very well" and said she was experiencing less stress since completing her final examinations at college. (T.444).

[7]

   On April 24, 2013, Plaintiff saw Dr. Heit in follow-up after being in the emergency room for shortness of breath with palpitations. She noted that Plaintiff was a "heavy smoker" and smoked two packs a day. Plaintiff said she "would like a note for class today." (T.448). Plaintiff presented to Dr. Heit on May 1, 2013, complaining of trouble walking far without shortness of breath. At that appointment, Plaintiff was diagnosed with tobacco dependence, and Dr. Heit again counseled her on smoking cessation. Plaintiff said she was down to less than a pack per day. Nonetheless, there is nothing in the record to indicate that Plaintiff ever quit smoking during the period at issue, much less at the time she saw Dr. Lieberg.

stenosis. On June 13, 2013, Dr. Lieberg relied on these studies and his clinical observations to diagnose Plaintiff with tendonitis, right rotator cuff, supraspinatus and infraspinatus tendons with partial tear; ligamentous strains, lumbosacral and cervical spine; and a mild bulging disc at L4-L5, which Dr. Lieberg noted was "sometimes considered normal." He opined that the "only one that has some real pathology is the right shoulder MRI, which shows partial thickness tear and tendinitis." Nonetheless, Dr. Lieberg stated, surgery was not recommended; Plaintiff "is going to have to learn to live with it." (T.290). He commented, "She has had this now for a total of almost four years and thinking that doing surgery on her shoulder is going to help . . . with her having tendinitis, it probably will not, and since her MRIs of the cervical spine and the lumbosacral spine do not show any surgical lesions, surgery is also not going to help and is not indicated." (T.290).

Plaintiff returned to Dr. Heit on August 7, 2013, complaining of pain from the rotator cuff tear, but she acknowledged that surgery had not been recommended. She asked Dr. Heit to fill out disability paperwork. Dr. Heit declined, noting that Plaintiff had "an old claim and [she] [did] not feel comfortable with her 'paperwork.'" (T.435). Dr. Heit recommended continuation of physical therapy and using a TENS unit. The ALJ's finding that Dr. Wadsworth's RFC Questionnaire was "inconsistent with the

subsequent records from 2013 and 2014" was supported by substantial evidence, and was a proper factor to consider in declining to assign controlling weight to Dr. Wadsworth's opinion. <u>See</u> 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the Commissioner] will give to that medical opinion.").

### 2.   **Physical Therapist Kim Jablonski**

On April 24, 2014, physical therapist Kim Jablonski ("PT Jablonski") completed an RFC Questionnaire. (T.368-69). PT Jablonski stated that she had seen Plaintiff for "several[8] courses of [PT] between 2009 [and] 2014." (T.368). Diagnoses included chronic cervical pain, low back pain, and right shoulder pain. (<u>Id.</u>). Other symptoms included headaches, and general weakness and instability. Her symptoms were severe enough to constantly interfere with her attention and concentration (<u>Id.</u>). During an 8-hour workday, she would need to recline or lay down, in addition to normal breaks; she could sit and stand/walk for 10 minutes at a time; and could sit for a total of 2 hours and and stand/walk for a total of 2 hours out of an 8-hour day. (T.368). She would also need to be able to shift positions at will and take

---

8

The record actually indicates that Plaintiff saw PT Jablonski in 2009 for about 15 sessions, between August 12, 2009, and November 25, 2009. (T.334-53). Plaintiff did not return to PT Jablonski until 2014, at which time she saw PT Jablonksi for only two sessions, on April 22nd and April 24th (the date PT Jablonski completed the RFC Questionnaire). (T.359, 362).

unscheduled five-minute breaks every 15-20 minutes (Id.). She could not lift any weight and was severely limited in her abilities to use her hands for gross and fine manipulation and in her ability to reach with either arm (T.369). She would miss work more than four times a month (Id.). PT Jablonski concluded that Plaintiff was unable to work a full-time job. (Id.). As the ALJ noted, a physical therapist is not an "acceptable medical source" as defined by the Commissioner's Regulations. Because the regulations do not classify physical therapists as either physicians or "other acceptable medical sources," physical therapists cannot provide "medical opinions." See Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). The ALJ accordingly considered PT Jablonski's RFC Questionnaire as an opinion provided by an "other source" under 20 C.F.R. §§ 404.1513(a), (d); 416.913(a), (d); SSR 06-03p. The ALJ assigned it "little weight," finding that, as was the case with Dr. Wadsworth's opinion, PT Jablonski's opinion was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion." Again, the Court finds that the ALJ did not misapply the relevant legal standards for weighing PT Jablonski's "other source" opinion; nor did the ALJ mischaracterize the record when she found that Plaintiff's daily living activities and the physical therapy records on file did not support the "severe limitations" assessed by PT Jablonski. (T.24).

### 3. Consultative Physician Dr. Karl Eurenius

Plaintiff faults the ALJ for assigning only "partial weight" to the report of consultative physician Dr. Karl Eurenius, who examined her on February 19, 2013. (T.259-62). Dr. Eurenius noted that Plaintiff alleged neck, back, and right-arm pain since her September 2009 MVA. She took only over-the-counter medications at the time. She lived with her brother and sister, whom she said did all the cooking, cleaning, laundry and shopping. She bathed daily, but needed help washing her hair. Her daily activities included watching television. On examination, Plaintiff was in no acute distress. Her gait was extremely slow, unsteady, and somewhat broad-based. She appeared unable to walk on heels or toes or to squat. Her station was bent slightly forward. She used no assistive device. She was slow in changing, and needed help getting on and off the examination table. She was able to rise from her chair only with difficulty. She displayed slightly limited ROM in her cervical spine, and limited ROM in her lumbar and thoracic spines. She had only slight limitations in her right shoulder ROM. She displayed full lower extremity ROM. There was marked reduction in sensation to touch and vibration in both legs, but deep tendon reflexes were normal. Dr. Eurenius diagnosed Plaintiff with chronic neck pain with occipital headaches; chronic low back pain with profound neuropathic symptoms in both legs, with poor documentation of her neck and back injuries; and right shoulder pain and limitation of

-17-

motion, uncertain etiology. For his medical source statement, Dr. Eurenius opined that Plaintiff was markedly limited in standing, walking, climbing, bending, lifting, carrying and kneeling due to her back pain. She was also moderately to markedly limited in lifting, carrying and reaching objects, especially with her right arm. Dr. Eurenius stated that her neuropathy was "profound *if* can be documented." (T.262) (emphasis supplied).

However, Plaintiff's alleged neuropathy was *not* able to be documented. In particular, the ALJ noted that subsequent nerve conduction studies were normal, with no evidence of peripheral nerve neuropathy or cervical radiculopathy. In particular, on March 7, 2014, Plaintiff saw Dr. Ziad Rifal, complaining of neck and right arm pain. An examination was normal, except for "giveaway" in the right arm; an electrodiagnostic test was normal with no evidence of cervical radiculopathy, brachial plexopathy, or peripheral nerve entrapment. (T.276). Also, on March 12, 2014, Plaintiff saw Dr. Andrew Ritting, complaining of right arm pain, numbness, and tingling. A nerve conduction test revealed no evidence of median nerve compression or any peripheral nerve impingement or compression. (T.287).

The ALJ also found Plaintiff's daily activities and overall treatment record, fully discussed above in her decision, suggested that Plaintiff was not "markedly" limited in postural activities. The Court agrees that this conclusion is supported by substantial

evidence in the record. For instance, when Plaintiff saw Dr. James Inzerillo on August 6, 2014, he could not determine any cause for Plaintiff's right shoulder pain in light of a normal MRI and EMG. (T.504). Dr. Inzerillo noted that her shoulder pain and back pain "appear[ed] to be skewed and exaggerated" and that her limited range of motion in the shoulder was due to "poor effort." (T.504). He reported that Plaintiff's "complaint of pain in so many areas palpated [did] not strike [him] as correlating to her lack of guarding of that limb," and she also showed no "apparent pain with ambulation or movement." (T.504). According to Dr. Inzerillo, Plaintiff's complaints of "very significant decrease in sensation throughout her [right arm and leg made] no neurological sense, especially with normal deep tendon reflexes." (T.505). Though she complained of an inability to raise her right "arm to the horizontal position," she "tested with strong motor strength." (T.505). Dr. Inzerillo also noted that Plaintiff's complaints of neck pain appeared to be "exaggerated." (T.505). As far as Plaintiff's daily activities, as the ALJ noted, she

> was able to attend classes, drive herself back and forth to school, and earn an associate's degree during the period at issue. By self-report, she was also able to do light house chores such as washing dishes, walk, drive or ride in a car, perform very basic food preparation, and help with pet care (Ex. 5E and 7E). More recently, she has applied for multiple jobs in such environments as fast food and supermarkets (Ex. 14F at 5-7; Hearing Testimony). In all, she appears to have maintained a somewhat normal level of daily activity and interaction. . . .

(T.22-23). The ALJ reasonably determined that these activities were inconsistent with Dr. Eurenius's assessment of "markedly" limited abilities in standing, walking, climbing, bending, lifting, carrying and kneeling due to her back pain.

### 4. Dr. Phillip Vitticore

Plaintiff alleges that the ALJ erred in failing to accord a specific amount of weight to Dr. Phillip Vitticore's opinion. (T.12). On April 8, 2014, Plaintiff saw Dr. Vitticore for her migraine headaches. His physical examination of Plaintiff was largely normal: she had full power upon shoulder shrug, she was sensory grossly intact to light touch and vibration, and she had good grip strength. (T.270-71). Dr. Vitticore assessed migraine, without aura, intractable, severe and debilitating. (T.271). At her second appointment a month later, on May 13, 2014, Plaintiff asked Dr. Vitticore to complete an RFC Questionnaire. (T.487-88). In the RFC Questionnaire, Dr. Vittocore's diagnoses included migraines with a poor prognosis. He stated that her symptoms would frequently interfere with her attention and concentration. During a normal workday, in additional to normal breaks, Plaintiff would need to recline or lie down. She would miss work more than 4 times a month, and was incapable of working full-time on a sustained basis.

Dr. Vitticore "treated" Plaintiff, and arguably the ALJ should have determined whether he was a treating source for purposes of the treating physician's rule of deference. However, the brevity of

Dr. Vitticore's treatment of Plaintiff weighs against such a finding; the length of the treatment relationship and the frequency of examination is one of the most important factors in determining whether a treating physician's opinion is entitled to controlling weight. See Ramos v. Comm'r of Soc. Sec., No. 13-CV-6561 AJN, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015) ("Affording a treating physician's opinion controlling weight reflects the reasoned judgment that treating physicians are "most able to provide a _detailed, longitudinal picture_ of [the claimant's] medical impairment(s) . . . .") (quoting 20 C.F.R. § 404.1527(c)(2); citation omitted; emphasis supplied). Here, Dr. Vitticore only saw Plaintiff twice, and at the second appointment, he agreed to fill out the RFC Questionnaire.

While the ALJ should have assigned a particular weight to Dr. Vitticore's opinion, she clearly considered it at step two, and accorded it no significant weight. (T.15). As the ALJ noted, Dr. Vitticore saw Plaintiff only once prior to completing the questionnaire in May 2014, and provided no support for his opinion that Plaintiff was unable to work, other than a recitation of Plaintiff's reported symptoms. (T.15, 487-88). Dr. Vitticore also declined to offer any opinion on functional limitations (T.15, 487-88). Notably, migraines were the only medical condition for which Plaintiff sought treatment from Dr. Vitticore. The ALJ did not determine that Plaintiff's alleged migraines were a "severe"

impairment, a finding that Plaintiff does not challenge on this appeal. Since Dr. Vitticore did not treat Plaintiff for any of the other impairments that the ALJ did find to be "severe," the Court cannot see how the ALJ's failure to assign a specific weight to Dr. Vitticore's opinion, after clearly considering it, had any effect on the ultimate decision. See Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) ("[W]here application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration.") (quotation omitted).

## II.  Erroneous Credibility Assessment

Plaintiff argues that the ALJ's credibility determination was not supported by substantial evidence. It is within the purview of the administrative law judge to reject a claimant's subjective complaints of severe, disabling pain, after evaluating the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility. E.g., Aponte v. Sec'y, Dept. of Health and Human Servs., 728 F.2d 588, 591-92 (2d Cir. 1984) (citation omitted). However, the credibility assessment must set forth with "sufficient specificity" to enable the reviewing court to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

Here, the ALJ's credibility determination complies with the applicable legal principles and is supported by substantial record

evidence. Plaintiff argues that the ALJ should not have factored her ability to attend college into the credibility assessment, because she required certain accommodations by the college's disability office.  While the Regulations provide that the Commissioner generally does not consider activities like taking care of oneself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be "substantial gainful activity,"  20 C.F.R. § 404.1572(c), the ALJ did not improperly equate Plaintiff's ability to attend college classes, with some accommodations, as conclusive evidence that she can engage in substantial gainful activity. The ALJ reasonably determined that Plaintiff's activities of daily living suggested that she had greater ability to perform work-related activities than she testified to. For instance, Plaintiff alleged an inability to sit for more than 10 to 15 minutes at a time, but, as the ALJ noted, she was able to attend college, take 12 credits per semester, and complete an associate's degree, and was able to drive for up to an hour on her commute to campus. (T.22-23, 37, 41). Courts in this Circuit have found that an ALJ may properly consider a claimant's ability to attend college or other schooling—even with accommodations—as among the claimant's "daily activities" that are relevant under 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). See, e.g., Wynn v. Astrue, 617 F. Supp.2d 177, 184 (W.D.N.Y. 2009); Fernandez v. Astrue, No. 1:06-CV-00479(LEK), 2009 WL 961492, at *13

(N.D.N.Y. Apr. 7, 2009). The ALJ further noted that Plaintiff collected unemployment insurance during the relevant period. (T.23). Courts in this Circuit "have held that an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that [s]he was ready, willing, and able to work during the time period for which [s]he claims disability benefits as adverse factors in the ALJ's credibility determination." Felix v. Astrue, No. 11-CV-3697 KAM, 2012 WL 3043203, at *10 (E.D.N.Y. July 24, 2012) (citations omitted).

Plaintiff argues that the ALJ should not have drawn an adverse inference regarding her credibility based on her lack of medical treatment between the 2009 MVA car accident and her 2012 applications for disability benefits. However, the Commissioner's regulations state that among the relevant factors to be considered in making a credibility determination are the frequency and types of treatment a claimant has received. See 20 C.F.R. §§ 404.1529(c)(3)(iv), (v), 416.929(c)(3)(iv), (v); see also Heagney-O'Hara v. Comm'r of Soc. Sec., 646 F. App'x 123, 125-26 (2d Cir. 2016) (unpublished opn.) (rejecting claimant's argument that "the ALJ improperly considered her decision not to pursue surgery when making his credibility determination" because "[a]n ALJ is required to consider a variety of factors when assessing a claimant's credibility, including whether the claimant has received treatment, other than medication, to relieve her

symptoms") (citation omitted). As the Commissioner argues, Plaintiff's purported reason for failing to seek treatment during the three-year period—that Dr. Lieberg told her that she was "going to have to learn to live with [the pain]"—is illogical: Dr. Lieberg made this statement on June 13, 2013, well after the gap in treatment. (T.290).

In sum, the Court finds that the ALJ's adverse credibility determination is not legally erroneous. The Court further finds that it is supported by substantial evidence in the record, and is set forth with sufficient specificity to permit the Court to "glean the rationale of [the] ALJ's decision." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983).

## V.    Conclusion

For the foregoing reasons, the Court finds that the Commissioner's decision is not legally flawed and is based on substantial evidence. Accordingly, it is affirmed. Defendant's motion for judgment on the pleadings is granted, and Plaintiff's motion for judgment on the pleadings is denied. The Clerk of Court is directed to close this case.

SO ORDERED.

S/Michael A. Telesca

_____
    HON. MICHAEL A. TELESCA
    United States District Judge

Dated:    March 24, 2017
          Rochester, New York.